UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARREN JEFFREY C.,<br><br>                     Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Commissioner of<br>Social Security,<br><br>                     Defendant. | Case No.:  3:21-cv-01012-AHG<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;**<br><br>**(2) DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(3) REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING ACTION FOR FURTHER ADMINISTRATIVE PROCEEDINGS**<br><br>**[ECF Nos. 17, 18]** |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (ECF No. 17) and Defendant's Cross-Motion for Summary Judgment (ECF No. 18).

Plaintiff Darren Jeffrey C. ("Plaintiff") filed this action on May 27, 2021 against the Commissioner of Social Security Kilolo Kijakazi ("Defendant" or "the Commissioner"), seeking judicial review of the Commissioner's final administrative decision denying his application for disability insurance benefits for lack of disability. ECF No. 1. Defendant filed the Administrative Record in lieu of an Answer on November 3, 2021. ECF Nos. 7, 8. The Court thereafter set a briefing schedule for the parties to file cross-motions for summary judgment, which they filed on February 7 and February 25, 2022, respectively. ECF Nos. 17, 18.

For the reasons explained below, the Court **GRANTS** Plaintiff's motion (ECF No. 17), **DENIES** Defendant's motion (ECF No. 18), **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this action for further proceedings consistent with this opinion.

## I.   PROCEDURAL BACKGROUND

On February 6, 2019, Plaintiff filed an application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, alleging disability beginning May 15, 2018 due to the impairments of hypertension and arthritis in his right hip and lower back. *See* Certified Administrative Record ("AR") 98, ECF No. 7-3. Plaintiff's application was initially denied on June 26, 2019, and again upon reconsideration on September 26, 2019. AR 97-123. Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on October 1, 2019, and the hearing was held before the ALJ on August 20, 2020. AR 139-140, 53-96. Plaintiff was represented by an attorney at the hearing. AR 53. During the hearing, Plaintiff amended his alleged disability date to July 23, 2018, the date he was injured on the job. *See* AR 16, 63-66.

On September 21, 2020, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled as defined by the Social Security Act, and accordingly denying disability insurance benefits. AR 16-28. The Appeals Council affirmed the ALJ's decision on

April 2, 2021, (AR 1-4), making the ALJ's opinion the final decision of the Commissioner. *See* 42 U.S.C. § 405(h). On May 27, 2021, Plaintiff timely commenced the instant appeal seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1.

## II.   SUMMARY OF ALJ'S FINDINGS

The ALJ determined Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2023. AR 18. Thereafter, the ALJ performed the required five-step sequential evaluation process governing DIB claims under the Social Security Act: (1) whether the claimant is involved in substantial gainful activity; (2) whether the claimant has an impairment or combination of impairments that is "severe"; (3) whether the claimant's impairments meet or equal one of the listed impairments; (4) whether the claimant can still perform his past relevant work given his residual functional capacity despite his impairment(s); and (5) if the claimant cannot perform past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4). The five steps are addressed in order, but the ALJ is not always required to go through all five steps of the process. Specifically, an affirmative answer at steps one or four (whether the claimant is currently engaged in substantial gainful activity or can perform past relative work), or a negative answer at step two (whether the claimant has an impairment or combination of impairments that is severe), would immediately lead to a finding of non-disability, and the analysis would stop there. Conversely, an affirmative answer at step three (whether the claimant's impairments meet a listing) would immediately lead to a finding of disability, also ending the analysis. *Id. See also Garfield v. Schweiker*, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

At step one of the five-step process, the ALJ was required to determine whether Plaintiff engaged in substantial gainful activity ("SGA") from his alleged disability onset date of July 23, 2018 through the date of the ALJ's decision. 20 C.F.R. § 404.1520(b). SGA is defined as work activity that is both substantial and gainful. 20 C.F.R. § 404.1572.

"Substantial work activity is work activity that involves doing significant physical or mental activities." C.F.R. § 404.1572(a). "Gainful work activity is work activity that you do for pay or profit." C.F.R. § 404.1572(b). The ALJ determined that Plaintiff did engage in SGA during the period of April 2019 through June 2019, but that Plaintiff did not engage in SGA between the amended disability onset date of July 23, 2018 through March 2019 and from July 2019 through the date of the decision. AR 19. Accordingly, Plaintiff's application for DIB with respect to the period of April 2019 – June 2019 was denied at step one due to Plaintiff's engagement in SGA during that period. Nonetheless, the ALJ proceeded to step two of the five-step evaluation process to determine whether Plaintiff was eligible for disability insurance benefits with respect to the period of more than 12 consecutive months during which Plaintiff did not perform any substantial gainful activity, i.e., June 2019 through the date of the ALJ's decision.

At step two, the ALJ must determine whether Plaintiff has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). A "severe" impairment is one that significantly limits physical or mental ability to do basic work activities. *Id.* The ALJ concluded that Plaintiff had the following "severe" impairments: degenerative disc disease of the lumbar spine, right hip degenerative joint disease and bursitis, ganglion cyst above the right acromioclavicular joint with full thickness tear of supraspinatus and infraspinatus tendons, right shoulder osteoarthritis, dermatitis, and right knee strain. AR 19.

Additionally, consistent with the requirements of SSR 19-2p, at step two the ALJ considered Plaintiff's medical determinable impairment of obesity both alone and in combination with Plaintiff's other impairments in assessing whether Plaintiff's obesity significantly limited his physical or mental ability to do basic work activities. The ALJ concluded that Plaintiff's obesity, alone or in combination, did not significantly limit Plaintiff's physical or mental ability to do basic work activities and thus deemed it a nonsevere impairment. AR 19. The ALJ further determined that Plaintiff's medically determinable impairments of scoliosis, hypertension, fatty liver, alcohol dependence,

degenerative disc disease of the cervical spine, major depressive disorder, generalized anxiety disorder, and adjustment disorder were all nonsevere. AR 20.

At step three, the ALJ must determine whether Plaintiff's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I ("the Listings"). The Listings describe impairments that the Social Security Agency ("SSA") considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). A claimant's impairment may also be considered "medically equivalent" to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). If a claimant's impairments meet or medically equal any of the listings, the ALJ will find the claimant disabled. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ concluded that none of Plaintiff's medically determinable impairments meets or medically equals the severity requirements of any listed impairment. AR 22.

Before considering whether Plaintiff could perform past relevant work at step four, the ALJ must first determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). A claimant's RFC is ". . . the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017). A claimant's RFC is based on all relevant evidence in the case record. *Id.*

Based on his evaluation of the medical and opinion evidence in the record, the ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except for the following physical limitations:

> [H]e can lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk four hours in an eight-hour workday with normal breaks; he can sit six hours in an eight-hour workday with normal breaks; he can occasionally reach overhead with the non-dominant right upper extremity; he can frequently handle, finger, feel, push, and pull with the right upper extremity; he can frequently operate foot controls bilaterally; he can frequently climb ramps and stairs; he must never climb ropes, ladders, or scaffolds; he can frequently balance; and he can occasionally stoop, kneel, crouch, and crawl.

AR 22. The ALJ included no mental limitations in Plaintiff's RFC.

At step four, the ALJ had to determine whether, given his RFC, Plaintiff could perform his relevant past work as a recreation leader, a landscape specialist, a social service aid, or an employment training specialist. *See* 20 C.F.R. § 404.1520(f); AR 27. Based on the testimony of the vocational expert ("VE") at the August 20, 2020 hearing, the ALJ determined that Plaintiff could perform his past relevant work as a social service aide and employment training specialist, which the VE testified Plaintiff performed as a composite job. AR 27. Therefore, the ALJ determined Plaintiff was not disabled at step four of the analysis and did not proceed to step five. AR 27.

## III.   **STANDARD OF REVIEW**

The Court reviews the Commissioner's decision to determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied and, if so, the Court must affirm the Commissioner's decision. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

"Substantial evidence means more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). In evaluating whether the Commissioner's decision is supported by substantial evidence on appeal, the Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986). The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, and is also responsible for resolving any ambiguities in the record. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

The Court may also overturn the Commissioner's denial of benefits if the denial is based on legal error. *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 929 (9th Cir. 2014). However, even if the Court finds the decision was based on legal error, a court may not reverse an ALJ's decision if the error is harmless, "which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Id.* at 932 (internal quotations and citation omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).

## IV.   **PARTIES' POSITIONS**

In his Motion for Summary Judgment, Plaintiff initially raised four issues on appeal, including whether the ALJ's opinion was constitutionally defective as a result of having derived his authority from a Commissioner who was not constitutionally appointed. *See* ECF No. 17-1 at 5, 22-24. However, after the Court requested supplemental briefing regarding the impact of the Ninth Circuit's decision in *Kaufmann v. Kijakazi*, 32 F.4th 843 (9th Cir. 2022) on that issue, Plaintiff voluntarily withdrew the issue from consideration, and asked that the Court only consider the first three issues raised in his motion. *See* ECF Nos. 20, 21. Accordingly, the Court will not address the constitutional issue in its analysis.

The remaining issues raised on appeal by Plaintiff include (1) whether the ALJ's RFC is contrary to law because it includes no mental limitations; (2) whether the ALJ's "credibility" assessment is deficient; and (3) whether the Appeals Council erred by finding that evidence Plaintiff submitted to it was not material. ECF No. 17-1 at 5-22. The Court will outline the parties' positions on each of these three issues in turn.

### A. Issue No. 1: Whether the ALJ committed reversible error by failing to include mental limitations in Plaintiff's RFC

First, Plaintiff argues the ALJ's RFC determination should have incorporated Plaintiff's mental limitations, notwithstanding that the ALJ found Plaintiff's mental impairments nonsevere at step two of the analysis. Plaintiff explains that the regulations require the ALJ to consider all of a claimant's impairments, even nonsevere impairments, when formulating the RFC. ECF No. 17-1 at 7; *see also* 20 C.F.R. § 404.1545(e) (providing

7

that when a claimant is found to have any severe impairments, but none of the impairments meets a Listing, the Agency "will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."). Plaintiff argues that the record plainly establishes that he has mental limitations, discussing the record evidence of his mental impairments at length, and noting that the ALJ found mild limitations in all four areas of mental functioning. ECF No. 17-1 at 8-13. *See also* AR 20-21.

In support of his argument that the ALJ's failure to incorporate mental limitations into the RFC warrants reversal, Plaintiff cites to a Ninth Circuit case finding reversible error where an ALJ found a claimant's depression to be a medically determinable but nonsevere mental impairment at step 2, but then "failed . . . even to mention [the plaintiff's] depression or mental impairments when assessing his RFC, and the RFC itself says nothing at all about such impairments or their effects[.]" *Loader v. Berryhill*, 722 F. App'x 653, 655 (9th Cir. 2018).

Relatedly, Plaintiff asserts the alleged error is only compounded by the ALJ's failure to obtain testimony from the vocational expert ("VE") during the hearing regarding a hypothetical RFC including mental limitations, and thus argues the VE's testimony cannot, as a matter of law, be considered substantial evidence supporting the ALJ's finding of nondisability. ECF No. 17-1 at 7-8. Plaintiff argues the exclusion of mental limitations from the RFC is "particularly critical" here, because the ALJ found Plaintiff capable of performing his highly skilled past job, and the Agency has explained in a Social Security Ruling that "losses of intellectual and emotional capacities are generally more serious when the job is complex." *Id.* at 8 (quoting SSR 85-15, 1985 WL 56857, at *4 (S.S.A. Jan. 1, 1985)).

Plaintiff argues that the failure to include mental limitations in his RFC is not harmless, because had the ALJ included such limitations, a finding of disability would have been required under the regulations due to Plaintiff's age and the limitation to light work. ECF No. 17-1 at 13 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, Grid Rule § 202.06).

Consistent with those regulations, the VE testified during the hearing that the addition of mental limitations to the hypothetical RFC that the ALJ ultimately assessed as Plaintiff's RFC would have precluded Plaintiff from performing his past relevant work as a social service aide and employment training specialist. *See* AR 94. Therefore, had the ALJ included mental limitations in Plaintiff's RFC, Plaintiff would have been found disabled.

Plaintiff also contends that the ALJ ignored or mischaracterized important record evidence to reach his conclusion that there should be no mental limitations in the RFC. First, Plaintiff asserts that the ALJ ignored evidence from Dr. Robert Zink, Ph.D., who completed a mental evaluation of Plaintiff in connection with Plaintiff's worker's compensation claim. *See* AR 1006-20. Plaintiffs argues that the ALJ's failure to address Dr. Zink's evaluation in his written decision "prevents meaningful judicial review" and that the assessment "can only support a finding that Plaintiff has, at the very least, *more than minimal* mental limitations." ECF No. 17-1 at 15. Second, Plaintiff argues the ALJ failed to acknowledge other mental health records, including mental status examinations showing Plaintiff had a depressed mood, anxious mood, flat affect, and a level of insight that "mostly involves blaming others for his problems." *Id.* (citing AR 1195, 1823, and 1846). Plaintiff thus accuses the ALJ of improperly "cherry-picking" the record by "select[ing] only normal examination findings from the record . . . to support the denial of benefits, while ignoring the abnormal examination findings." ECF No. 17-1 at 15-16. Third, Plaintiff argues that the ALJ's finding that Plaintiff "was treated conservatively with medications" is a mischaracterization of the record because the ALJ "failed to acknowledge that [Plaintiff's] Lexapro was increased and that he was also prescribed Risperidone[,]" which "is supportive of a finding that he has more than minimal mental limitations[.]" *Id.* at 16.

Finally, Plaintiff takes issue with the ALJ's consideration of Plaintiff's receipt of unemployment benefits in the ALJ's evaluation of Plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of his symptoms. *Id.* at 16-17. Plaintiff asserts that Agency policy prohibits adjudicators from considering a claimant's

receipt of unemployment benefits "as a negative credibility factor." *Id.* at 16. In support, Plaintiff cites to two memos issued by the Chief ALJ in November 2006 and in August 2010, emphasizing that a claimant's receipt of unemployment benefits "does not preclude the receipt of Social Security disability benefits." *Id.* at 16-17 (citations omitted). Plaintiff notes that in this case, such a rule is particularly apposite because a person in Plaintiff's age category who cannot perform his past work and who has no transferable skills[1] should be deemed disabled under the grid rules regardless of whether he has the ability to perform other light or sedentary jobs existing in significant numbers in the national economy. Because this issue overlaps significantly with Issue No. 2, the Court will address Plaintiff's argument on this point in its discussion of that issue.

In response to Issue No. 1, Defendant states that the ALJ's exclusion of mental limitations from Plaintiff's RFC was proper and "[c]onsistent with the ALJ's mild findings at step two[.]" ECF No. 18 at 11. Specifically, Defendant outlines the record evidence on which the ALJ relied at step two to find Plaintiff's mental impairments nonsevere, and notes that while the ALJ "acknowledged that the limitations in the step two analysis were not an RFC assessment," he "explained that the RFC finding 'reflect[ed] the degree of limitation' that the ALJ 'found in the paragraph B mental function analysis' [at step two of the evaluation.]" *Id.* at 8-10 (quoting AR 21-22)). Defendant cites to cases from this district and the Central District of California in which courts rejected similar arguments that the ALJ erred by failing to include mild mental limitations in the RFC, where, as here, the ALJ considered the Paragraph B criteria at steps two and three of the sequential evaluation process and expressly stated that the RFC assessment reflected the degree of mental

---

[1] If the ALJ had included mental limitations in Plaintiff's RFC, the VE testified that Plaintiff would not have any transferable skills, thus directing a finding of "disabled" under Grid Rule 202.06. *See* AR 94-95; *Barnes v. Berryhill*, 895 F.3d 702, 706-07 (9th Cir. 2018) ("Grid rule 202.06 states that a person of 'advanced age' who has a high school education and skilled or semi-skilled work experience but no transferable skills is disabled.").

limitation the ALJ found in the Paragraph B analysis. *See* ECF No. 18 at 12 (citing *Huang v. Berryhill*, No. 16-CV-02966-WQH-MDD, 2017 WL 6557757, at *3, *8-9 (S.D. Cal. Dec. 22, 2017), *report and recommendation adopted*, 2018 WL 480806 (S.D. Cal. Jan. 19, 2018) and *Medlock v. Colvin*, No. CV 15-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016)).

Defendant further discusses the record evidence relied on by the ALJ to make his findings that Plaintiff had no more than mild limitations in areas of mental functioning, including Plaintiff's mental status examinations, daily activities, ability to maintain part-time employment, and conservative treatment regimen, and notes that "no physician opined as to any functional limitations from Plaintiff's mental impairments." ECF No. 18 at 8-10. Defendant also argues that the ALJ properly found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms to be inconsistent with other record evidence, and that he supported his conclusion with substantial evidence. ECF No. 18 at 10-11.

As for Dr. Zink's evaluation of Plaintiff's symptoms in connection with the workers' compensation claim, Defendant argues that Dr. Zink's report is not a medical opinion under the applicable regulations, because he did not identify any functional limitations. *Id.* at 13 (quoting 20 C.F.R. § 404.1513(a)(2) for the proposition that a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in performing the physical or mental demands of work activities). Additionally, Defendant notes that categories under California's workers' compensation program and under the Social Security disability scheme are measured quite differently, and thus Dr. Zink's assessment that Plaintiff was "temporarily partially psychologically disabled" is not an opinion or functional limitation relevant to Plaintiff's disability claim. ECF No. 18 at 13 n.6. Defendant further argues that, even assuming that the ALJ should have evaluated Dr. Zink's report, the diagnoses, normal examination findings, and activities of daily living documented in the report are consistent with the other record evidence that the ALJ

expressly discussed in finding that Plaintiff did not have any severe mental impairments or any mental functional limitations, and Dr. Zink "noted that Plaintiff was able to continue working in his job for the City of San Diego." *Id.* at 13-14. Thus, Defendant contends that any error stemming from the ALJ's failure to discuss Dr. Zink's report was harmless. *Id.*

With respect to Plaintiff's arguments that the record evidence generally supports the conclusion that Plaintiff has mental limitations, Defendant argues that Plaintiff must do more than point to his diagnoses of mental impairments, because the existence of an impairment alone does not establish that the impairment necessarily results in functional limitations. Defendant argues that the ALJ properly discounted Plaintiff's self-reports regarding the severity of his symptoms and reasonably relied instead on clinical evidence, particularly since no provider assessed any mental functional restrictions, and Plaintiff has not identified any specific limitations that the evidence supported but that the ALJ failed to include in the RFC. *Id.* at 14-15. Defendant counters Plaintiff's argument that even minimal mental limitations would affect his ability to perform his past relevant work, noting that a mild limitation is "only a slight restriction in functioning" and does not necessarily translate to any functional restrictions in a claimant's RFC. *Id.* at 15.

Addressing Plaintiff's argument that the ALJ mischaracterized the record by finding that Plaintiff's mental impairments were treated conservatively with medication, Defendant responds that Plaintiff "simply cites evidence of medication management, not evidence of mental functional limitations" and argues the ALJ's finding that Plaintiff was treated conservatively with medication "was accurate[.]" *Id.* at 16.

Finally, Defendant argues that Plaintiff misrepresents Agency policy regarding the ALJ's consideration of Plaintiff's receipt of unemployment benefits, noting that while receipt of unemployment benefits "may not necessarily preclude the receipt of disability benefits, an 'application for unemployment benefits is evidence that the ALJ must consider together with all of the medical and other evidence.'" *Id.* (quoting the Chief ALJ memos provided by Plaintiff at Exs. A and B to Plaintiff's motion, ECF Nos. 17-2, 17-3). Defendant contends that the ALJ appropriately found Plaintiff's testimony that he had told

the unemployment office that he was willing and able to work, and that he had applied "everywhere" for full time jobs, to be inconsistent with his claims of disabling mental and physical impairments. *Id.*

**B. Issue No. 2: Whether the ALJ erred by discounting Plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of his symptoms**

Next, Plaintiff argues that the ALJ's assessment of Plaintiff's "credibility"—i.e., whether Plaintiff's self-report of the intensity, persistence, and limiting effects of his symptoms—was deficient. ECF No. 17-1 at 20-22. In particular, Plaintiff points to his "impeccable work history showing an uninterrupted 25-year work history prior to filing his claim," and argues that agency policy requires the ALJ to consider a claimant's exemplary work history when making a credibility assessment. *Id.* at 21. Although Plaintiff acknowledges that his exemplary work history does not necessarily entitle him to an assumption of "enhanced credibility," he argues that the ALJ "was plainly required to consider this fact pursuant to Agency authority" and erred by not doing so. *Id.*

In response, Defendant argues that the ALJ's consideration of Plaintiff's testimony was appropriate, and that there is no authority to support Plaintiff's assertion that an ALJ is required to discuss a claimant's "exemplary work history" when evaluating his symptoms. ECF No. 18 at 19. Defendant thus asks the Court to "join other district courts in 'reject[ing] the contention that the ALJ is required to address a claimant's exemplary work history in assessing her credibility.'" *Id.* (quoting *Morgan v. Saul*, No. 1:19-cv-00605-BAM, 2020 WL 6285190, at *6 (E.D. Cal. Oct. 27, 2020) and citing *Greer v. Comm'r of Soc. Sec.*, No. SA CV 17-01316-DFM, 2018 WL 5885942, at *8 (C.D. Cal. Nov. 7, 2018)) (other citations omitted). Additionally, because this claim of error overlaps with Plaintiff's first claim of error regarding whether the ALJ appropriately considered Plaintiff's own testimony about the intensity, persistence, and limiting effects of his symptoms when determining whether to include mental limitations in Plaintiff's RFC,

Defendant incorporated her prior arguments regarding Issue No. 1 in her response to Issue No. 2. ECF No. 18 at 19.

### C. Issue No. 3: Whether the Appeals Council committed reversible error by finding that evidence submitted to it was not material

Plaintiff's final claim of error is that the Appeals Council erred by finding that the new and additional evidence Plaintiff submitted to the Council regarding his mental limitations was not material. Specifically, in support of his request for review by the Appeals Council, Plaintiff submitted mental health records from the Psychiatric Centers at San Diego dated between June and October 2020. AR 36-52. The Appeals Council found that this additional evidence "does not show a reasonable probability that it would change the outcome of the decision." AR 2. Plaintiff argues that this finding by the Appeals Council was "patently unreasonable[,]" because the records show diagnoses of major depressive disorder categorized as "severe," generalized anxiety disorder categorized as "severe," panic disorder, and PTSD rated as "severe." ECF No. 17-1 at 19. The records also contain mental status examinations revealing flat affect, slightly irritable mood, depressed mood, anxious mood, derealization, preoccupation/rumination, and thought content that was obsessive, depressive, and paranoid. *Id.* (citing AR 37, 50). Plaintiff argues that this additional evidence establishes that he has more than minimal mental limitations and the Appeals Council thus should have found that it had a reasonable probability of changing the outcome of the case. Plaintiff argues that because the Appeals Council found otherwise and did not consider the evidence material, "meaningful judicial review is impossible and the case should be remanded." ECF No. 17-1 at 20.

Defendant responds that, although Plaintiff cites to diagnoses in the records showing that various mental impairments were rated as "severe," a diagnosis is insufficient to establish that an impairment is severe or functionally limiting for the purpose of a disability evaluation. ECF No. 18 at 18 (citing *Yanchar v. Berryhill*, 720 F. App'x 367, 370 (9th Cir. 2017) and *Leddy v. Berryhill*, 702 F. App'x 647, 648 (9th Cir. 2017)). Defendant further states that Plaintiff's characterization of the Appeals Council finding is erroneous, because

the Appeals Council did not find the evidence was "not material," but rather considered the evidence and found that it did not provide a basis for changing the ALJ's decision. ECF No. 18 at 17. Defendant argues that substantial evidence supports the ALJ's findings notwithstanding Plaintiff's later-submitted evidence, which is the proper inquiry. *Id.* In particular, Defendant contends that the later-submitted evidence did not show that any mental health providers recommended changes in his treatment, that Plaintiff's mental status examinations in the new records were largely normal, consistent with the records considered by the ALJ, and that in October 2020, the provider terminated one of Plaintiff's medications. *Id.* (citing to AR 20-21, 37-38, 39, 43, and 51). Additionally, Defendant notes that the later-submitted records "do not identify any restrictions or limitations concerning Plaintiff's mental functional abilities." ECF No 18 at 18. Based on this analysis, Defendant asserts that the later-submitted evidence is consistent with the earlier evidence that the ALJ considered, revealing largely normal mental status examination findings and conservative treatment through medication management, and thus the Appeals Council did not err by finding that the later-submitted evidence did not show a reasonable probability of changing the outcome.

## V.  DISCUSSION

### A. Whether the ALJ committed reversible error by failing to include mental limitations in Plaintiff's RFC

The ALJ found that Plaintiff's medically determinable mental impairments of major depressive disorder, generalized anxiety disorder, and adjustment disorder "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and [are] therefore nonsevere." AR 20. Notwithstanding this finding, the ALJ was required by the regulations to consider the limiting effects of all of Plaintiff's impairments, even those that are not severe, in determining Plaintiff's RFC. 20 C.F.R. § 404.1545(e). *See also* SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Plaintiff contends that the

ALJ failed to do so here. The Commissioner responds that the ALJ's statement that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" at step two of the sequential disability evaluation process is sufficient to show that he properly considered whether Plaintiff's mild limitations found at step two should translate into mental functional limitations in the RFC, and determined that they should not.

At step two of the five-step disability evaluation, the ALJ considered the four broad functional areas of mental functioning set forth in the regulations for evaluating mental disorders. These four functional areas include (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (listing these "four broad functional areas in which [the Agency] will rate the degree of [a claimant's] functional limitation" when evaluating mental impairments). These four functional areas are also known as the "paragraph B criteria" due to how they are categorized in the listings. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ found that Plaintiff had only mild limitations in all four areas of mental functioning. AR 20-21.

Plaintiff accurately states that the ALJ's assessment of a claimant's limitations under the paragraph B criteria is not the same as an RFC assessment, which requires a more detailed analysis:

> While similar evidence may be used in both assessments of Plaintiff's mental impairments, they are distinct, and limitations assessed in the context of the paragraph B assessment are not necessarily transferable to the more detailed assessment required when formulating the RFC. The ALJ's task when assessing the RFC is not to provide an adequate explanation for how the RFC accommodates the ALJ's paragraph B findings, but rather to perform a new, more detailed assessment incorporating *all* the relevant evidence.

*JW U. C. v. Comm'r of Soc. Sec.*, No. 2:19-CV-00090-DWC, 2019 WL 3451515, at *2 (W.D. Wash. July 31, 2019) (citing SSR 96-8p, 1996 WL 374184, at *4 (stating that "the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential

evaluation process" and "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment . . . .); and *Israel v. Astrue*, 494 F. App'x 794, 796 (9th Cir. 2012) (rejecting a claimant's argument that the ALJ should have incorporated his own step 3 finding that the claimant had "moderate difficulties" in the area of concentration, persistence, or pace into the RFC determination, because "[t]he limitations identified in step 3 [] are '*not* an RFC assessment,'" and the ALJ must consider step three limitations along with "'*all* of the relevant evidence in the case record'" when making the RFC determination) (quoting SSR 96-8p, at *4 and *5)).

As Defendant points out, however, courts in the Ninth Circuit "have routinely found that a statement from the ALJ that the degree of limitation found in the paragraph B mental functional analysis was incorporated into the RFC is sufficient to meet the requirements set forth in Social Security regulations." *JW U.C.*, 2019 WL 3451515, at *2 (citing *Van Houten v. Berryhill*, 2019 WL 691200, at *14 (E.D. Cal., Feb. 19, 2019) and *Scotellaro v. Colvin*, 2015 WL 4275970, at *9 (D. Nev. June 22, 2015)). The Commissioner also relies on cases in which similar statements were found to be sufficient. *See Huang*, 2017 WL 6557757, at *3, *8-9 (finding no error where the ALJ found the claimant had mild mental limitations in social functioning, daily living, and concentration, persistence, and pace, but found the impairments nonsevere and included no mental limitations in the RFC determination, because, as here, the ALJ stated that the "residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" at steps 2 and 3 of the sequential evaluation process and thus "expressly incorporated Plaintiff's mild mental limitations into the RFC following step 3"); *Medlock*, 2016 WL 6137399, at *5 (finding no error where the ALJ did not incorporate the claimant's mental limitations in the RFC, because while "[t]he Agency requires an ALJ to consider the limiting effects of all impairments, including those which are non-severe[,] [c]onsideration of 'the limiting effects of all impairments' does not necessarily require the inclusion of every impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work.")

(citations omitted) (emphasis deleted). The ALJ made exactly such a statement in his opinion here, stating that his "residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" while also acknowledging that the limitations identified in the paragraph B criteria are not the same as an RFC assessment, which "requires a more detailed assessment." AR 21-22.

However, the fact that the ALJ stated that he incorporated Plaintiff's mental limitations into the RFC determination does not end the Court's inquiry. As the *Medlock* court explained, the ALJ may not "rely on boilerplate language," and must "actually review[] the record and specif[y] reasons supported by substantial evidence for not including the non-severe impairment" in the RFC assessment. 2016 WL 6137399, at *5. Indeed, the court there distinguished another case on which the plaintiff relied, *Hutton v. Astrue*, 491 F. App'x 850, 851 (9th Cir. 2012), on the basis that in *Hutton*, the court found the ALJ's exclusion of the plaintiff's mild mental limitations from the RFC determination to be erroneous "specifically because the ALJ failed to even consider plaintiff's limitation at step four once he determined the limitation was mild and non-severe at step two. Unlike the ALJ in *Hutton*, the ALJ in this case thoroughly considered the medical evidence related to Plaintiff's mild mental impairment at step four before choosing not to include the limitation in the RFC determination. Consequently, the ALJ's omission was not legal error." *Medlock*, 2016 WL 6137399, at *5. The facts of this case more closely match those in *Hutton* than those in *Medlock*, because the ALJ here also failed to discuss Plaintiff's mental limitations at any other step in the sequential evaluation process after finding them to be mild at step two. *See generally* AR 22-27.

In the other case on which the Commissioner relies, *Huang v. Berryhill*, the court also required more than a mere recitation by the ALJ that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.'" 2017 WL 6557757, at *9. The *Huang* court also discussed how the ALJ cited to Plaintiff's primary care treatment records and the opinions of state agency psychological consultants, ultimately finding that the ALJ complied with SSR 96-8p because he

"***specifically considered the record evidence*** and expressly incorporated Plaintiff's mild mental limitations into the RFC following step 3 of the sequential evaluation." *Id.* (emphasis added).

Other cases from the Ninth Circuit affirming ALJ opinions with the same language tell a similar story. In *Van Houten*, the court affirmed the Commissioner's decision not only because the ALJ included boilerplate language that the RFC assessment "reflects the degree of limitation" found in the paragraph B mental function analysis, but also because the ALJ "considered Plaintiff's mental impairments in formulating the RFC" by "review[ing] the medical record related to Plaintiff's mental impairments" between steps three and four of the sequential analysis, including psychological evaluations by three separate providers. 2019 WL 691200, at *14. The *Scotellaro* court also affirmed the Commissioner because "the ALJ's Decision demonstrates that he considered Plaintiff's non-severe mental impairment in her RFC. He did so by providing a thorough analysis of the psychological evaluations of Drs. Nash and Javine. . . . The ALJ considered the psychologists' diagnosis—an adjustment disorder—and he agreed with their opinions that Plaintiff's mental impairment does not cause more than minimal limitation in her ability to perform basic mental work activities." 2015 WL 4275970, at *9. Therefore, although the court acknowledged that the ALJ "did not extensively discuss Plaintiff's mental impairment at step four," the court found no reversible error because "[a]n ALJ is required to discuss and evaluate evidence that supports his conclusion; he is not required to do so under any specific heading." *Id.*

In other words, a boilerplate statement that the RFC "reflects the degree of limitation" the ALJ found at steps two and three is not sufficient to show that the requisite "more detailed assessment" required by the RFC determination was actually conducted. Thus, the Court must evaluate whether the ALJ supported his RFC finding by specifying "reasons supported by substantial evidence" for not including any mental functional limitations stemming from Plaintiff's non-severe mental impairments. *Medlock*, 2016 WL 6137399, at *5. That question is implicated by Plaintiff's claim of error that the ALJ

improperly "cherry-picked" the record by selecting only normal mental status examination findings, while ignoring the wealth of mental status examinations showing that Plaintiff presented with depressed mood, anxious mood, flat affect, and poor insight. ECF No. 17-1 at 15-16. To evaluate this claim of error, the Court will go through each piece of evidence on which the ALJ purported to rely when assessing Plaintiff's mental limitations.

       *i.*    *Record evidence relied on by the ALJ to assess the degree of Plaintiff's mental limitations*

After having determined Plaintiff's mental impairments to be non-severe at step two of the analysis, the ALJ never again discussed or even mentioned Plaintiff's mental limitations in his RFC analysis, which deals solely with the exertional limitations caused by Plaintiff's physical impairments. *See* AR 22-27. Therefore, the ALJ's discussion of the limitations caused by Plaintiff's mental impairments is confined to the step two analysis, where the ALJ rated Plaintiff's degree of limitation with respect to each of the four broad areas of mental functioning, finding only mild limitations in each area. AR 20-22. Notably, on appeal, Plaintiff does not directly challenge the ALJ's step two finding that his mental impairments were non-severe. Nonetheless, because the ALJ expressly stated that his later RFC assessment "reflects the degree of limitation [] found in the 'paragraph B' mental function analysis" at step two, and he did not discuss Plaintiff's mental limitations elsewhere in the opinion. the Court must look to that portion of the opinion in determining whether substantial evidence supports the ALJ's exclusion of any mental functional limitations from the RFC assessment.

First, the ALJ found that Plaintiff had a mild limitation in the area of understanding, remembering or applying information. In support, the ALJ noted that findings from Plaintiff's mental status examinations "revealed mildly impaired judgment." AR 20 (citing AR 1195, a February 6, 2020 treatment record from a psychiatric diagnostic evaluation at the Psychiatric Centers at San Diego ("PCSD"), in which the treating nurse practitioner noted that Plaintiff had an "impaired ability to make reasonable decisions: Mild"). However, the ALJ cited to other records showing that Plaintiff's "thought process, thought

content, intelligence, and cognition were consistently within normal limits" and described Plaintiff's activities of daily living, including reading the Bible, using the computer, running errands, managing his medications, maintaining part-time employment, and managing his finances, as evidence that Plaintiff had "some ability to understand, remember, or apply information." AR 20 (citing AR 1080-1258 (treatment records from the workers' compensation appeal board), 1819-1858 (treatment records from PCSD), 209-211 (wage record from part-time employment), 235-240 (exertional activities questionnaire), AR 626 (treatment records from an initial pain management consultation with Concentra, showing Plaintiff's self-reported physical abilities), AR 1081 (describing Plaintiff's activities of daily living, including managing medications and managing money), 1520 (describing Plaintiff's activities of daily living, including reading the bible). Additionally, the ALJ stated "there is insufficient evidence to establish that the claimant's ability to learn, recall, or use information to perform work activities independently, appropriately, effectively, and on a sustained basis was seriously limited." AR 20. Therefore, the ALJ found that the evidence supported a finding of no more than a mild limitation in the area of understanding, remembering, or applying information. AR 20.

Second, the ALJ found that Plaintiff had a mild limitation in interacting with others. He based this finding on mental status examinations that "consistently revealed normal eye contact and cooperative attitude." AR 20 (citing to AR 1080-1308 (treatment records from the workers' compensation appeal board) and 1819-58 (treatment records from PCSD)). The ALJ also pointed to Plaintiff's ability to "run errands, take walks, ride his bicycle, ha[ve] a wife and friends, maintain part-time employment, shop in stores," and the fact he "has a good personal relationship[] with his adult son" to show that "he is able to interact appropriately with others, maintain relationships, and/or be in public places." AR 20 (citing to AR 209-211, (wage record from part-time employment), 235-240 (exertional activities questionnaire), 626 (treatment records from an initial pain management consultation with Concentra, showing Plaintiff's self-reported physical abilities), 1520 (describing Plaintiff's activities of daily living, including that he has a friendship with a coworker and a good

personal relationship with his adult son), and 1805 (describing Plaintiff's current activity level, including that he takes brief walks daily and brief bike rides around the neighborhood).

Third, the ALJ found that Plaintiff had a mild limitation in concentrating, persisting, or maintaining pace. AR 21. To support this finding, the ALJ again cited to the treatment records from the workers' compensation appeal board and the treatment records from PCSD to conclude that Plaintiff's mental status examinations "did not reveal difficulties in this functional area" and that his "thought process, thought content, intelligence, and cognition were consistently with normal limits." AR 21 (citing to AR 1080-1258 (treatment records from the workers' compensation appeal board), 1819-58 (treatment records from PCSD) for both propositions). The ALJ also once more pointed to record evidence showing that Plaintiff was "able to maintain part-time employment, read the bible use the computer, run errands, and manage his finances, which are activities that require some ability to concentrate, persist, or maintain pace." AR 21 (citing to AR 209-11 (wage record from part-time employment), AR 626 (treatment records from an initial pain management consultation with Concentra, showing Plaintiff's self-reported physical abilities), 1081 (describing Plaintiff's activities of daily living, including managing medications and managing money), 1520 (describing Plaintiff's activities of daily living, including reading the bible)). Lastly, the ALJ stated that "there is insufficient evidence to establish that the claimant's ability [to] focus attention on work activities or stay on task at a sustained rate independently, appropriately, effectively, and on a sustained basis was seriously limited." AR 21.

Fourth, the ALJ found that Plaintiff had a mild limitation in the functional area of adapting or managing oneself. The ALJ relied on much of the same record evidence he had previously cited to support this conclusion, explaining that Plaintiff "was able to maintain part-time employment, maintain his grooming and hygiene, prepare meals, write, use the computer, run errands, perform light housework, manage medications, manage his finances, take walks, ride his bicycle, do the laundry, garden, vacuum, shop in stores, cook,

and read the bible." AR 21 (citing AR 209-11 (wage record from part-time employment), 235-240 (exertional activities questionnaire), 626 (treatment records from an initial pain management consultation with Concentra, showing Plaintiff's self-reported physical abilities), 1081 (describing Plaintiff's activities of daily living, including managing medications and managing money), 1520 (describing Plaintiff's activities of daily living, including reading the bible), 1805 (describing Plaintiff's current activity level, including that he takes brief walks daily and brief bike rides around the neighborhood), and 1833 (treatment records from PCSD stating that Plaintiff "does gardening and cooking and is enjoying it.")). The ALJ also stated that "there is insufficient evidence to establish that the claimant's ability to regulate emotions, control behavior, or maintain well-being in a work setting independently, appropriately, effectively, and on a sustained basis was seriously limited." AR 21.

Following his individualized evaluation of each of the four broad areas of mental functioning, the ALJ acknowledged that "[t]he record shows that the claimant complained of insomnia, nightmares, anxiety, panic attacks, loss of memory, angry outbursts, suspiciousness, loss of appetite, and irritability." AR 21 (citing AR 1192). The ALJ further recognized that "[t]he findings from the mental status examinations revealed irritable mood and mild impairment in judgment." AR 21 (citing AR 1195). Nonetheless, the ALJ explained that "the objective findings were consistently within normal limits" and Plaintiff "was treated conservatively with medications." AR 21 (citing AR 1194-95 and AR 1819-58 for the first proposition and AR 1857 for the second). The ALJ further explained that Plaintiff "did not provide any medical source statements from his treating physicians, psychologists, psychiatrists, or therapists; as such, the undersigned has relied heavily on the objective medical evidence of record." AR 21.

ii.    *Whether the ALJ mischaracterized the record to reach his conclusions*

The Court has independently reviewed the record evidence on which the ALJ relied in that portion of the opinion involving Plaintiff's mental limitations, and finds that the ALJ mischaracterized and ignored significant record evidence in reaching his conclusions,

1   particularly with respect to Plaintiff's limitations in the area of interacting with others.

2   Thus, the Court finds that the ALJ committed reversible error by failing to specify reasons

3   supported by substantial evidence for not including any mental limitations in the RFC as a

4   result of Plaintiff's nonsevere impairments of major depressive disorder, generalized

5   anxiety disorder, and adjustment disorder. *See Medlock*, 2016 WL 6137399, at *5.

6        Although the ALJ notes in passing that Plaintiff complained of insomnia,

7   nightmares, anxiety, panic attacks, loss of memory, angry outbursts, suspiciousness, loss

8   of appetite, and irritability, and that his mental status examinations revealed irritable mood

9   and mild impairment in judgment, he does not provide any substantive discussion of these

10  symptoms or explain how he reached the conclusion that they do not translate into mental

11  functional limitations in the RFC. AR 21. Instead, he dismisses them out of hand by stating

12  that objective findings from Plaintiff's mental health treatment records were "[o]therwise"

13  within normal limits. AR 21.

14       In so doing, the ALJ barely scratches the surface of Plaintiff's symptomology and

15  mischaracterizes the overall picture of Plaintiff's mental functioning. The record is replete

16  with documentation of Plaintiff's severe post-traumatic stress disorder symptoms,

17  stemming from two separate events during his military service in the 1980s when he

18  witnessed a plane crash and saw body parts of the victims of the crash, and when he later

19  had to salvage a burned-out car containing the body parts of service members he knew. *See*

20  AR 1013 (portion of Dr. Zink's November 2019 psychological evaluation, stating that

21  when he was in the Marines and stationed at Camp Pendleton, Plaintiff witnessed a private

22  plane crash "[r]ight in front of our campsite and we had to pick up the body parts[,]" leading

23  to "nightmares, anxiety when seeing cues that reminded him of the event, and intrusive

24  recollections" and that later during Plaintiff's military service, "a number of Marines who

25  were working with him took out a vehicle and suffered an accidental crash. The vehicle

26  burned. The vehicle was brought back to the shop and [Plaintiff] had to salvage the vehicle.

27  There were body parts in the vehicle, all of which was very distress[ing] to him, especially

28  because they were individuals whom he had known"); AR 1854 (PCSD treatment records

24

from February 6, 2020 mentioning that Plaintiff reported PTSD from a "military event" and that he was on a waiting list to attend trauma therapy through the VA); AR 1846 (PCSD treatment records from April 9, 2020 noting that he had "2 differ[e]nt episodes wher[e] he had to deal with body parts and saw an accident and had to pick up body parts while in the military" and that he went to therapy in the past "when he had seen the body parts from the plane crash while in the military"); AR 1013-14 (portion of Dr. Zink's evaluation explaining that Plaintiff went to the VA about two years prior for counseling and psychiatric medication due to residual PTSD symptoms stemming from the plane crash and car salvage incidents, and still experiences some anxiety when he sees cues that remind him of the plane crash); AR 1018-19 (portion of Dr. Zink's evaluation describing that Plaintiff still has nightmares from these incidents in the Marines, and struggles with insomnia, occasional rises of anxiety with mild panic feelings, feelings of suspiciousness about others, irritability, and anxiety when he sees cues that remind him of either incident).

Plaintiff also suffers from significant mental health symptoms as a result of a more recent event in July 2018 when, while Plaintiff was working as a recreation leader for the City of San Diego at Chollas Lake Park, someone intentionally rammed Plaintiff's golf cart with a truck in an attempt to kill him after Plaintiff caught him and another man attempting to steal construction tools. AR 1010, 1843, 1853. *See also* AR 1018-19 (Dr. Zink's report describing Plaintiff's psychological symptoms, including but not limited to "[n]ightmares from the times that he was in the Marines and also he still has a nightmare of the truck that hit his cart in the injury of 07/25/18" and "trepidation when he approaches people at Chollas Lake near closing time, hoping that they are not having some type of violent intention").

These traumatic events led to insomnia, nightmares, panic attacks, loss of memory, angry outbursts, suspiciousness, and loss of appetite, leading him to seek psychiatric treatment first at the VA in 2017 and later at PCSD in February 2020. Records from PCSD dated February 6, 2020, show that Plaintiff sought treatment because these issues had plagued him for the past two years since the attack, and that he "will get angry and yell,

angry about 3 times a week, angry about minor details, doesn't get along with co-workers, still hold[s] grudge against supervisor who he says caused his injury." AR 1192. Other records similarly show that Plaintiff has had conflicts with coworkers since being attacked on the job, once being disciplined after yelling at a coworker who almost ran over his foot with a golf cart, and another time leaving work early due to anger at another coworker for showing up to work late. AR 1011-12. These events led to discipline by his supervisor and a reduction in work hours, which continued up until at least the time of the hearing before the ALJ. *See* AR 81-83. Plaintiff's work schedule was also changed so that he would work only on days when those two coworkers were not scheduled to work, "to avoid any further conflicts." AR 1012. Plaintiff reported to Dr. Zink that the incident affected him "big time," that he believes the outcome was unfair, and that the incident continues to "contribut[e] to his emotional distress." AR 1012. He also expressed that "he could possibly use some counseling to help him deal with his anger toward his supervisor at the workplace. He said he has no intention of hurting anyone, but he feels he has been treated poorly at the workplace and that feeling continues to plague him." AR 1013. Dr. Zink also noted in his assessment of Plaintiff's psychological symptoms that Plaintiff has "[f]eelings of distress" regarding the problems he had with the two coworkers, "and the resulting change in his work hours and decreased income." AR 1019.

Consistent with these treatment records, Plaintiff testified before the ALJ that he once "had a mental breakdown" and left work early after his coworker showed up late, because "[e]ven though I already got injured and they know I shouldn't be left alone they continued to leave me alone." AR 82-83. Plaintiff also testified that he often has to mentally prepare himself for an hour to go to work due to anxiety and worry about having to interact with members of the public and coworkers, and confirmed that "the physical nature of the injury" and "fear" stemming from having been attacked at work "has caused a deterioration in [his] mental health condition." AR 85-87. Plaintiff further testified that he has had disagreements with "several" coworkers outside of the two incidents that led to disciplinary procedures because he is "short tempered" and "agitated," particularly since the pandemic

began, leading to "all these angry people out there." AR 86-88. Again, this testimony is bolstered by treatment records in which Plaintiff's mental health treatment providers and psychological evaluators consistently noted that Plaintiff experiences anxiety, panic, feelings of suspiciousness about others, insomnia, nightmares from the traumatic experiences in the military and anxiety when seeing cues that remind him of the plane crash or the vehicle he had to salvage with body parts still in the vehicle, trepidation when approaching people in the park near closing time, fearing that they may intend violence, and feelings of distress regarding his problems with coworkers. *See* AR 1018-19 (Dr. Zink's psychological evaluation from November 12, 2019, documenting all of these psychological symptoms among others), 1841 (PCSD treatment records from April 13, 2020, stating that Plaintiff "has nightmares of the traumatic events where he caught a guy trying to steal and then the person 'tried to kill him'" and that Plaintiff's issues and concerns include "dealing with the aftermath of having been assaulted while working. He also feels like if he saw one of the guys they might try to hurt him again. He carries mace and a knife and that makes him feel better. Says he got a panic attack when going shopping. . . . says he is waking up with a cold sweat and having panic attacks"); AR 1828 (treatment records from May 12, 2020 stating that Plaintiff "is having nightmares and has had some panic attacks at work and was upset about his coworker being belligerent with people at the lake when they close").

Turning to the evidence on which the ALJ relied to find only a mild limitation in the area of interacting with others, the Court finds it does not amount to substantial evidence to support the ALJ's ultimate conclusion that Plaintiff should have no functional mental limitations in his RFC related to this area of functioning—that is, it is not "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels*, 874 F.3d at 654.

First, the ability to take walks and ride a bicycle have no bearing on the ability to interact with others. Second, as for the ability to run errands and maintain part-time employment, as discussed in detail above, the record shows that Plaintiff has panic attacks

when going shopping and at work, has problems getting along with his coworkers and faced disciplinary action at work due to his conflicts with coworkers and his short temper, and that he "carries mace and a knife" due to his fear of being attacked while working again. AR 86-88, 1828, 1841. The ALJ's citation to the record showing Plaintiff's self-reported physical abilities to support the finding that Plaintiff is only mildly limited in the area of interacting with others similarly falls short of the low "substantial evidence" bar. While Plaintiff reported running errands in that record, he also reported that he does not engage in social or recreational activities. *See* AR 626. The other record evidence consistently shows that Plaintiff reports "limited" social relationships and support network, and that he isolates himself and socially withdraws. AR 1019, 1844, 1854. He also reported relationship problems with his wife and intrafamily conflicts with his wife and daughter. AR 1832, 1843. Additionally, Plaintiff reported having a panic attack while shopping and having panic attacks at work. AR 1828, 1841.

Third, the ALJ relied on a wealth of treatment records to find Plaintiff was no more than mildly limited in the area of social functioning, because Plaintiff's mental status examinations "consistently revealed normal eye contact and cooperative attitude." AR 20 (citing to AR 1080-1308 (treatment records from the workers' compensation appeal board) and 1819-1858 (treatment records from PCSD)). Yet a closer look at these very same records reveals a very different picture than the one painted by the ALJ's description of Plaintiff's "normal eye contact and cooperative attitude." As an initial matter, the records from the workers' compensation appeal board at AR 1080-1308 almost exclusively concern Plaintiff's physical injuries to his right hip, right knee, and lower back, and therefore, the vast majority of these records do not contain mental status examinations of any kind. AR 1080-1159, 1161-68, 1173-87, 1198-1247, 1249-56, 1258-66, 1268-73, 1275-80, 1282-87, 1289-95, 1297-1308. One April 2019 treatment record from Concentra in this portion of medical records contains a "psychiatric" section of the physical exam, in which Plaintiff was noted to have appropriate speech in content and delivery and an appropriate mood and effect. AR 1160. Similarly, US Health Works treatment records from

seven visits throughout July, August, November, and December 2018 Works, again dealing with an evaluation of Plaintiff's physical injuries, contain "psychiatric" sections of the physical exams, each stating that Plaintiff "is alert and oriented to person, place and time" with an "appropriate" mood and affect. AR 1248, 1257, 1267, 1274, 1281, 1288, 1296. The December record also states that Plaintiff "appears to be in a happier mood." AR 1248. Additionally, the workers' compensation appeal board records include treatment notes from two of Plaintiff's visits to PCSD on February 6 and March 12, 2020, which are duplicates of some of the PCSD records located in the record in full at AR 1819-1858. AR 1171-72, 1188-99. These records from two psychiatric visits appear to be the specific source of the ALJ's finding that Plaintiff's mental status examinations "consistently revealed normal eye contact and cooperative attitude[,]" containing mental status examinations of "average" eye contact and a "cooperative" attitude towards the examiner. However, they also show that Plaintiff was found to have an impaired ability to make reasonable decisions, insight involving "mostly blam[ing] others for his problems," tense posture, and an irritable mood, although he was "[a] bit less irritable" at the second visit. AR 1172, 1194-95. Dr. Zink's psychological evaluation of Plaintiff also listed irritability and a degree of social withdrawal among the list of Plaintiff's psychological symptoms. AR 1018-19. Therefore, contrary to the ALJ's characterization, Plaintiff's mental status examinations did not "consistently" reveal a cooperative attitude.

The final record evidence on which the ALJ relied for the proposition that Plaintiff "consistently had normal eye contact and a cooperative attitude," and thus was only mildly limited in his ability to interact with others, are Plaintiff's psychiatric treatment records from PCSD documenting eight visits between February 6, 2020 and May 22, 2020. AR 1819-58. The Court has already summarized the salient findings of those records above, but it bears repeating that the ALJ's focus on mental status examinations showing "normal eye contact" and "a cooperative attitude," while ignoring the overall picture painted by those records in order to find that Plaintiff is only mildly limited in interacting with others, amounts to improper cherry-picking. These records show that Plaintiff "has angry

outbursts," sleeps only 3 hours per night and struggles with insomnia and difficulty staying asleep, suffers from decreased appetite resulting in 25 pounds of weight loss in two years and has to make himself eat (AR 1834-38 and 1849-52), that Plaintiff has anxiety and PTSD, including nightmares of reexperiencing the trauma of being attacked on the job, loss of interest and enjoyment in things, gets emotional and cries easily, lacks focus and is easily distracted, is irritable and snaps easily, feels depressed, and has panic attacks three times per week (AR 1843-48), that Plaintiff has nightmares about the traumatic event when he was intentionally hit by a truck, wakes up in a cold sweat and having panic attacks, had a panic attack when going shopping, and has had panic attacks at work (AR 1828, 1839-42).

The ALJ further stated that "[t]here is insufficient evidence to establish that the claimant's ability to relate to and work with supervisors, co-workers, or the public independently, appropriately, effectively, and on a sustained basis was seriously limited." AR 20. However, as detailed above, Plaintiff has had several documented conflicts with supervisors and coworkers, as well as fear and anxiety stemming from having to deal with the general public in connection with his job after he was intentionally hit by a truck when approaching people in the park at closing time. Again, his conflicts with coworkers led to a permanent reduction in hours at his job and being scheduled to work when those coworkers were not working, an arrangement that was still in place at the time of the hearing before the ALJ. When Plaintiff sought psychiatric treatment at PCSD in February of 2020, he appeared with the chief complaint of anger and conflict with coworkers, reporting that he "will get angry and yell . . . about minor details," about three times per week, that he "doesn't get along with co-workers," and that he still holds a grudge against the supervisor whom he blames for his injury. AR 1192. Plaintiff reported to every psychiatric treatment provider that he had continuing anxiety, anger, fear, and nightmares all resulting from the attack at work. The ALJ does not mention or address any of this evidence in his opinion, only providing the conclusory statement that the evidence is "insufficient" to establish any serious degree of limitation in Plaintiff's ability to relate to

and work with supervisors, coworkers, or the public independently, appropriately, effectively, and on a sustained basis.

The ALJ also mischaracterizes other record evidence to reject Plaintiff's subjective reports of his symptomology. In finding that the degree of Plaintiff's subjective complaints "is not comparable to the extent of treatment sought by" Plaintiff, the ALJ incorrectly states that "nowhere in the record does the claimant offer a sufficient explanation for not seeking treatment consistent with the degree of subjective complaints. For example, nowhere in the record does it indicate that the inconsistency between the alleged severity of symptoms and the treatment sought was an inability to pay or lack of insurance." However, Plaintiff gave several explanations in the record for not seeking more aggressive treatment for both his physical and psychological symptoms.

First, the record shows that Plaintiff took Sertraline and Hydroxyzine for PTSD symptoms for about two years "but stopped about two months ago because he couldn't afford the copays." AR 1010, 1014. *See also* AR 1853-54 (noting that Plaintiff was treated for depression and anxiety at the VA and took Sertraline, but was concerned about the cost of the Sertraline). Therefore, the ALJ's statement that there was no evidence in the record that Plaintiff did not seek more aggressive treatment due to "inability to pay" is demonstrably untrue. Second, other treatment records show that the Sertraline caused him to have loose stool, an upset stomach, and nausea, but was otherwise not effective. AR 1192, 1189. *See also* AR 1024 (Dr. Zink noting that Plaintiff was "hesitant to take any more psychiatric medication as the Sertraline he was taking from the VA caused some side effect difficulties for him (gastrointestinal problems)."). Third, Plaintiff testified during the hearing before the ALJ that the COVID-19 pandemic restricted his ability to seek medical care. *See* AR 74 (Plaintiff explaining that "because of Covid, everything's been shut down and I haven't had . . . any doctors' appointments."). These, too, are explanations offered by Plaintiff in the record for not pursuing a more aggressive treatment regimen.

Moreover, Plaintiff was prescribed Lexapro after his first visit to PCSD in February 2020, and his treatment providers additionally prescribed him Risperidone in

April 2020 to assist with his poor sleep, irritability, and anxiety, and increased his dosage of Lexapro in May 2020. AR 1825, 1838. While Defendant is correct that this is merely "evidence of medication management, not evidence of mental functional limitations," *see* ECF No. 18 at 16, that argument misses the point. The ALJ was required to specify reasons supported by substantial evidence for his RFC assessment, including his determination that Plaintiff had no mental functional limitations. One of the reasons put forth by the ALJ to support his assessment of only mild limitations in the areas of mental functioning was that Plaintiff "was treated conservatively with medications." AR 21. That reasoning is significantly undermined by the fact that Plaintiff's mental health treatment providers at PCSD found Plaintiff was making only minimal progress and responded by adding a second medication and increasing the dosage of the first. The Court's charge is to determine whether the ALJ's decision was supported by substantial evidence. Thus, the Court must examine every reason provided by the ALJ that might shed light on why he excluded mental limitations from his ultimate RFC assessment despite finding that Plaintiff had the medically determinable impairments of major depressive disorder, generalized anxiety disorder, and adjustment disorder at step two. Because the ALJ did not supply any reasons for his exclusion of mental limitations from the RFC assessment in the portion of the opinion explaining Plaintiff's RFC, the Court must look to the reasoning supplied in the step-two analysis to determine whether it amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels*, 874 F.3d at 654. The ALJ's reliance on the fact that Plaintiff was treated conservatively with medications for his mental impairments does not meet that threshold when viewed in the larger context of Plaintiff's mental health treatment history.

In sum, the reasons relied on by the ALJ to assess Plaintiff's mental limitations at step two do not amount to substantial evidence. To reach his conclusions, the ALJ improperly cherry-picked statements in the medical record indicating Plaintiff had normal eye contact and a cooperative attitude without reading those observations "in context of the overall diagnostic picture the provider draws." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th

Cir. 2014). *See also id.* at 1164 (finding error where the ALJ "recited facts from the examining physicians' evaluations about [the claimant's] cognitive capabilities and generally pleasant demeanor" because reliance on such observations was "misplaced" in light of the claimant's testimony that "nightmares, insomnia, social anxiety, and depression—not any cognitive impairments—caused him difficulty" and finding the ALJ "improperly cherry-picked" on physician's characterizations of the claimant's rapport and demeanor instead of considering these factors in the context of the doctor's diagnoses and observations of impairment, including that the claimant appeared "quite anxious," endorsed symptoms of PTSD, and that the doctor diagnosed him with depressive disorder NOS, PTSD, and anxiety disorder NOS). *Accord Henderson v. Saul*, No. 2:19-CV-00028-NJK, 2020 WL 774360, at *4 (D. Nev. Feb. 18, 2020) ("An ALJ must review the record as a whole and is not permitted to mischaracterize that record by 'cherry-picking' aspects in an effort to support a finding of non-disability."). Similarly, here, the ALJ failed to support his assessment of Plaintiff's mental limitations at step two with substantial evidence, instead picking out certain aspects of Plaintiff's mental status examinations to find mild limitations while ignoring the overall diagnostic picture that consistently showed more debilitating symptoms associated with Plaintiff's depression, anxiety, and adjustment disorder. Consequently, the ALJ's boilerplate incorporation of those step-two findings into the later RFC assessment, without specifying "reasons supported by substantial evidence" for not including any mental functional limitations stemming from Plaintiff's non-severe mental impairments, was in error. *Medlock*, 2016 WL 6137399, at *5.

The Court further finds that the error was not harmless. Here, the VE testified that if the ALJ included mental limitations in the RFC that the ALJ ultimately assessed as Plaintiff's RFC in his decision, it would rule out Plaintiff's past work as an employment training specialist and social service aide, and would also rule out the transferability of Plaintiff's skills to the sedentary job of job development specialist. AR 91-95. Critically, the VE responded, "Correct" in response to the ALJ's question, "There is not – transferable skills when you start applying the mental limitations?" AR 94-95. Because the ALJ later

adopted that RFC with no mental limitations, he found that Plaintiff was capable of performing his past work as an employment training specialist and social service aide as actually performed, which the VE testified Plaintiff performed as a composite job. AR 27.

This testimony from the VE indicates that had the ALJ included any mental limitations in Plaintiff's RFC, he would have been required to find Plaintiff disabled under the Grid Rule § 202.06. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Grid Rule § 202.06. Accordingly, the error is not harmless and the Commissioner's decision must be reversed.

In reaching this conclusion, the Court acknowledges that Plaintiff bears the burden of providing he is disabled, and agrees that Plaintiff fails in his brief to identify the specific mental limitations that should have been included in his RFC. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). However, this case is distinguishable from the cases relied upon by Defendant to argue that the Court should affirm the Commissioner's decision due to Plaintiff's failure to identify the specific mental functional limitations that should have been included in his RFC.

In *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 n.2 (9th Cir. 2009), Defendant correctly notes that the court "reject[ed] any invitation to find that the ALJ failed to account for [the plaintiff's] injuries in some unspecified way." However, prior to that statement, the court explained that the plaintiff alleged the ALJ erred by omitting his cervical and lumbar spine injuries and knee and shoulder injuries, and rejected that claim of error because, as for the cervical and lumbar spine injuries, "[t]he record reveals no indication that they caused [the plaintiff] problems after" his alleged disability onset date, and as for the knee and shoulder injuries, "[t]he ALJ concluded at Step 2 that they were severe, and the RFC includes several physical limitations. [The plaintiff] does not detail what other physical limitations follow from the evidence of his knee and should[er] injuries, ***besides the limitations already listed in the RFC***." *Id.* (emphasis added). Therefore, the court found that the RFC adequately accounted for the impairments at issue and rejected the plaintiff's argument that the RFC should have included unspecified additional limitations. Further, looking at the full context of the case, the Ninth Circuit had

already rejected the plaintiff's argument that the ALJ "ignored evidence of [the plaintiff's] impairments when she fashioned his RFC[,]" explaining that "the RFC actually incorporated the evidence that [the plaintiff] argues it ignored." *Id.* at 691-92. Accordingly, based on its review of the record evidence, the *Valentine* court found no merit in the plaintiff's contentions that the ALJ had failed to account for the limitations caused by his impairments or had otherwise failed to properly consider the evidence. But the court was not, as Defendant suggests, issuing a broader holding that courts must always reject a plaintiff's claim of error where the plaintiff fails to explain the specific functional limitations that should have been included in the RFC. Rather, courts may properly find error where an ALJ finds an impairment to be medically determinable at step two (even if non-severe), but fails to consider such impairment in assessing the claimant's RFC, which may be evidenced where the ALJ "fail[s] . . . even to mention" the impairments when engaging in the RFC assessment, and where "the RFC itself says nothing at all about such impairments or their effects." *Loader v. Berryhill*, 722 F. App'x 653, 655 (9th Cir. 2018).

Similarly, in *Dimartini v. Colvin*, No. 3:15-cv-00997-GC-JMA, 2016 WL 4142344, at *4-*6 (S.D. Cal. Aug. 4, 2016), the ALJ provided an extensive review of the record, including the records of psychological consultants, mental status examinations, reports of activities of daily living, and medical notes, to "properly account[] for Plaintiff's non-severe mental limitations in the RFC, in accordance with the medical evidence in the record." *Id.* at *5. On review, the Court found that the ALJ "engaged in a sufficient [RFC] assessment that was consistent with the mental limitations identified in the medical record" and accordingly concluded that the ALJ's RFC determination was "supported by substantial evidence and is free from material legal error." *Id.* at *6. Therefore, the Court rejected Plaintiff's argument that mental functional restrictions should have been included in her RFC, finding that "Plaintiff does not provide, ***and the record does not contain***, any evidence indicating that Plaintiff has any functional restrictions that prevent her from performing her prior job as a music teacher." *Id.* (emphasis added). In contrast, here, the Court finds that the record contains ample evidence of mental functional restrictions, and

3:21-cv-01012-AHG

the record evidence on which the ALJ relied to find only mild limitations at step two was largely mischaracterized and does not meet the substantial evidence standard. Therefore, this case is more akin to the facts of *Hutton*, where the Court found that the ALJ "mischaracterized [the plaintiff's] testimony at least five times[,]" failed to address the lay testimony of the plaintiff's wife and college counselor appropriately by "repeatedly mischaracterizing [the wife's] testimony" and failing to refer to the counselor's testimony detailing an incident where the plaintiff had an emotional reaction in class due to memories of his military service, forcing him to withdraw from people and class, and "disregard[ed] his own finding that [the plaintiff's] nonsevere PTSD caused some 'mild' limitations in the areas of concentration, persistence, or pace" by failing to include the plaintiff's PTSD in his RFC analysis and in his hypotheticals to the vocational expert. 491 F. App'x at 851. Accordingly, the Ninth Circuit found the ALJ committed reversible error, explaining that "[r]egardless of its severity," the ALJ "was still required to consider [the plaintiff's] PTSD" when assessing his RFC. *Accord Loader*, 722 F. App'x at 655.

Therefore, notwithstanding Plaintiff's failure to identify specific functional mental limitations that should have been included in his RFC, the ALJ erred by failing to consider the effects of Plaintiff's nonsevere medically determinable mental impairments in his RFC assessment, and by failing to support his analysis of the limitations caused by those impairments with substantial evidence.

**B. Plaintiff's Other Arguments in Support of Issue No. 1**

Because the Court finds that the ALJ committed reversible error by failing to support the exclusion of mental limitations from Plaintiff's RFC with substantial evidence, it is not necessary to address Plaintiff's other claims of error regarding whether the ALJ should have considered Plaintiff's exemplary work history in assessing his subjective statements regarding his symptoms and whether the Appeals Council erred by finding that Plaintiff's later-submitted evidence did not show a reasonable probability of changing the outcome. However, to guide the Agency's analysis on remand, the Court finds it important to clarify that many of Plaintiff's arguments made in support of his first claim of error on Issue No. 1

are without merit. The Court will briefly outline those arguments that it found unpersuasive. Additionally, because Issue No. 2 overlaps with Issue No. 1 to the extent Plaintiff believes the ALJ's assessment of Plaintiff's subjective statements should have taken his exemplary work history into account, the Court will include that claim of error in its discussion.

> i.  *Plaintiff's argument that his exemplary work history should have been considered in the ALJ's assessment of Plaintiff's subjective statements*

Plaintiff argued that the ALJ should have considered Plaintiff's exemplary work history when assessing the consistency and supportability of Plaintiff's subjective reports of the intensity, persistence, and limiting effects of his symptoms, which Plaintiff refers to as a "credibility" analysis. In support, Plaintiff cites to several sources of regulatory authority and case law, including 20 C.F.R. § 1529(c)(3), SSR 96-8p, SSR 16-3p, *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038-39 (9th Cir. 2007), and *Simmons v. Colvin*, No. ED CV 15-01865-SP, 2016 WL 6436829, at *8 (C.D. Cal. Oct. 31, 2016).

The Court finds Plaintiff's argument is based on an outdated understanding of the regulations, as interpreted by courts prior to the Agency's issuance of Social Security Ruling ("SSR") 16-3p in March 2016. In SSR 16-3p, the Agency rescinded its prior ruling in SSR 96-7p: "Policy Interpretation Ruling Titles II and XVI Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements" and replaced it with SSR 16-3p: "Titles II and XVI: Evaluation of Symptoms in Disability Claims." *See* SSR 16-3p, 2017 WL 5180304, at *2 (S.S.A. Oct. 25, 2017).[2]

---

[2] SSR 16-3P was originally issued on March 16, 2016. *See* SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016). The Social Security Administration later republished the ruling on March 24, 2016 to correct the "Effective Date" caption, *see* SSR 16-3P, 2016 WL 1237954, and again republished the ruling on October 25, 2017 to change the terminology used therein from "effective date" to "applicable date" based on guidance from the Office of the Federal Register, and to update citations to reflect the revised regulations that became effective on March 27, 2017. SSR 16-3P, 2017 WL 5180304, at *1. The ruling is otherwise unchanged. The Court cites to the most recent republication from October 2017 but notes

37

Importantly, the reason the Agency eliminated the use of the term "credibility" in referring to assessments of a claimant's subjective statements regarding his symptoms is that the term implies that the assessment is an evaluation of the claimant's personal character, which is inapposite to a disability determination. SSR 16-3p, 2017 WL 5180304, at *2 (explaining, "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that *subjective symptom evaluation is not an examination of an individual's character*.") (emphasis added). *See also Travis T. v. Comm'r of Soc. Sec.*, No. C21-5907-BAT, 2022 WL 2256186, at *3 n.3 (W.D. Wash. June 23, 2022) (rejecting the plaintiff's use of the term "consistency/credibility determination" in his briefing as "not grounded in either Ninth Circuit jurisprudence or the regulations[,]" because "[e]ffective March 28, 2016, the Social Security Administration eliminated the term 'credibility' from its policy and clarified the evaluation of a claimant's subjective symptoms is not an examination of character."). For the same reason, the Court rejects the notion that the ALJ should have considered Plaintiff's exemplary work history in assessing whether his testimony regarding the severity, persistence, and limiting effects of his symptoms was consistent with the objective evidence of record. The ALJ should no more credit a claimant for a strong work ethic than he should discredit a claimant for untrustworthiness. The claimant's personal character is, in short, irrelevant to the analysis.

Although Plaintiff also relies on current regulations in making his argument, he does not accurately summarize what those regulations say. For example, Plaintiff cites to 20 C.F.R. § 404.1529(c)(3) for the proposition that agency policy "requires that a claimant's exemplary work history be considered as part of a credibility assessment." ECF No. 17-1

---

that the key purpose of the ruling—to eliminate the use of the term "credibility" from disability determinations and to "clarify that subjective symptom evaluation is not an examination of an individual's character"—went into effect more than 18 months earlier on March 28, 2016.

at 21. However, this is not an accurate summary of that provision. When read in full, the regulation makes clear that the ALJ's charge is to provide a holistic assessment of both objective medical evidence ***and*** the claimant's subjective reports of symptom-related functional limitations and restrictions, without necessarily privileging one type of information over the other, based on the Agency's recognition that "symptoms, such as pain, are subjective and difficult to quantify[.]" 20 C.F.R. § 404.1529(c)(3). While that holistic assessment does indeed require the ALJ to look to the claimant's prior work record, the purpose of considering such evidence is to determine whether a claimant's subjective reports "can reasonably be accepted as consistent with the objective medical evidence and other evidence," not to conduct an assessment of the claimant's personal character based on his work ethic. *Id.* Therefore, the Court did not rely on this argument in finding that the ALJ failed to support his RFC determination with substantial evidence.

      *ii.*    *Plaintiff's argument that it was error for the ALJ to rely on the receipt of unemployment benefits in assessing Plaintiff's subjective statements*

Plaintiff also argued that "SSA policy prohibits reliance upon receipt of unemployment compensation benefits as a negative credibility factor." ECF No. 17-1 at 16. The Court finds that Plaintiff mischaracterizes the policy at issue. While it is true that the two memoranda issued by the SSA on which Plaintiff relies state that "the receipt of unemployment insurance benefits does not preclude the receipt of Social Security benefits[,]" the same memoranda both state that "[t]he receipt of unemployment benefits is only ***one of many factors that must be considered*** in determining whether the claimant is disabled." *See* ECF Nos. 17-2, 17-3 (Nov. 15, 2006 and Aug. 9, 2010 Memoranda from Chief ALJ Frank A. Cristaudo to Regional Chief Judges and all SSA ALJs, respectively) (emphasis added). Therefore, it was permissible for the ALJ to include Plaintiff's receipt of unemployment benefits during the relevant time period as one of the factors he considered when assessing whether Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were consistent with the record. It was not the only piece of evidence on which the ALJ relied, nor did the ALJ indicate that

Plaintiff's receipt of such benefits during the relevant period should automatically preclude a finding of disability. Therefore, the Court rejects this argument and did not rely on it in finding that the ALJ failed to support his RFC determination with substantial evidence.

        iii.     *Plaintiff's argument that it was error for the ALJ not to expressly discuss Dr. Zink's psychological evaluation*

Agency regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities[,]" which include but are not limited to the ability "to perform mental demands of work activities, such as understanding; remembering; maintain concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting[.]" 20 C.F.R. § 404.1513(a)(2). Because Dr. Zink did not prepare his psychological evaluation in connection with Plaintiff's disability claim, his assessment does not address those particular categories of functioning in the language that would be used on a standard Mental Residual Functional Capacity Assessment form. *See* POMS DI 24510.060 (internal Social Security regulation discussing form SSA-4734-F4-SUP, used to document medical opinions regarding a claimant's mental RFC), *available at* http://policy.ssa.gov/poms.nsf/lnx/0424510060 (last visited Sep. 13, 2022). Additionally, the regulations are clear that a state agency workers' compensation decision about whether a claimant is disabled or entitled to any benefits based on their rules, "is not binding on [the Agency] and is not our decision about whether you are disabled [] under our rules." 20 C.F.R. § 404.1504. Therefore, for claims like Plaintiff's filed on or after March 27, 2017, the regulations state that the Agency "will not provide any analysis in our determination or decision about a decision made by any other governmental agency . . . about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the governmental agency['s] decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4)." *Id.*

1     Based on these regulations, the Court agrees with Defendant that the ALJ was not

2  required to treat Dr. Zink's psychological evaluation as a "medical opinion." Consequently,

3  the ALJ did not commit legal error by failing to expressly discuss Dr. Zink's opinion and

4  to articulate how persuasive he found it in accordance with the factors set forth in 20 C.F.R.

5  § 404.1520c. Nonetheless, Dr. Zink's evaluation is an important piece of medical evidence

6  in the record, reflecting a comprehensive clinical interview involving three hours of direct

7  face-to-face interaction with Plaintiff, a two-hour review of Plaintiff's medical records

8  from 29 medical appointments Plaintiff attended between July 26, 2018 (the day after

9  Plaintiff's disability onset date of July 25, 2018, when he was attacked and injured at work)

10 to September 30, 2019 (approximately six weeks prior to Dr. Zink's evaluation), a review

11 of Plaintiff's psychosocial history, a mental status examination, behavioral observations, a

12 psychosocial history questionnaire, and a battery of psychological testing completed by

13 Plaintiff, including a Mini-Mental State Exam, Million Clinical Multiaxial Inventory – III,

14 Beck Anxiety Inventory, Beck Depression Inventory – II, Beck Hopelessness Scale. *See*

15 AR 1006-17. Therefore, even if the evaluation does not qualify as a "medical opinion" that

16 the ALJ was required to expressly discuss in his opinion, the ALJ was required to evaluate

17 it under 20 C.F.R. § 404.1513 as both "objective medical evidence" (insofar as the

18 assessment documented medical signs and laboratory findings) and "other medical

19 evidence" (insofar as the assessment documented Dr. Zink's "judgments about the nature

20 and severity" of Plaintiff's impairments, Plaintiff's medical history, and Dr. Zink's clinical

21 findings, diagnoses, and prognoses).

22     Thus, the question of whether the ALJ properly considered the medical evidence

23 contained in Dr. Zink's psychological evaluation dovetails with the broader question of

24 whether the ALJ supported his exclusion of mental limitations from the RFC determination

25 with substantial evidence from the record, an issue on which Plaintiff prevailed for the

26 reasons already explained. However, in finding in Plaintiff's favor on that issue, the Court

27 emphasizes that it did not find any error in the ALJ's failure to expressly articulate how

28 persuasive he found Dr. Zink's evaluation to be, based on its consistency and

supportability, as he would have been required to do had the evaluation qualified as a "medical opinion" pursuant to 20 C.F.R. § 404.1520c.

## VI.    THE APPROPRIATE REMEDY

Having found that the ALJ committed reversible error, the next issue for determination is whether a remand for further proceedings, or a remand for payment of benefits, is appropriate. "The decision whether to remand for further proceedings or simply to award benefits is within the discretion of this court." *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011).

As discussed above, the VE hearing testimony indicates that, had the ALJ included mental limitations of any kind in Plaintiff's RFC, he would have been required to find Plaintiff disabled under the Grid Rule § 202.06. *See* AR 91-95; 20 C.F.R. Part 404, Subpart P, Appendix 2, Grid Rule § 202.06. However, it is beyond the purview of the Court to determine Plaintiff's RFC on appeal. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (explaining that "it is up to the ALJ, not the court, to determine how [the plaintiff's medically determinable] impairments affect the formulation of [the plaintiff's] RFC."); 20 C.F.R. § 404.1527(d)(2) (stating that the final determination of a claimant's RFC is reserved to the Commissioner).

Therefore, although the record indicates that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, there are outstanding issues that must be resolved before a disability determination can be made. Namely, on remand, the ALJ must determine how Plaintiff's medically determinable mental impairments affect his RFC, and he must rely on substantial record evidence in reaching his conclusion.

Accordingly, the Court finds the appropriate remedy is to reverse the Commissioner's decision and to remand for further administrative proceedings consistent

with this opinion. On remand, the ALJ must reconsider the record evidence regarding Plaintiff's mental impairments in determining Plaintiff's RFC.

## VII. CONCLUSION

Based on the foregoing analysis, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 17), **DENIES** Defendant's Cross-Motion for Summary Judgment (ECF No. 18), **REVERSES** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), and **REMANDS** this action for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 26, 2022

Honorable Allison H. Goddard
United States Magistrate Judge